UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

GYPSUM RESOURCES, LLC, a Nevada limited liability company,

Plaintiff,

v.

CLARK COUNTY, a political subdivision of the State of Nevada; and CLARK COUNTY BOARD OF COMMISSIONERS,

Defendants.

CLARK COUNTY, a political subdivision of the State of Nevada; and CLARK COUNTY BOARD OF COMMISSIONERS,

Counterclaimant,

v.

GYPSUM RESOURCES, LLC, a Nevada limited liability company,

Counterdefendant.

Case No. 2:19-cv-00850-GMN-EJY

**ORDER**

Pending before the Court is Gypsum Resources, LLC's Motion for Imposition of Sanctions against Commissioner Justin Jones for Fraud Upon the Court and Destruction of Evidence.[1] ECF No. 82. Also pending is Gypsum's Motion for Sanction Against Defendants.[2] ECF No. 90. The Court reviewed both Motions, the Oppositions (ECF Nos. 83 and 102), and the Replies (ECF Nos. 87 and 107). The parties are also aware the Court held a lengthy hearing on a prior motion filed by Gypsum and issued an order that led to the present filings. ECF Nos. 73, 78.

---

[1] Gypsum Resources, LLC is referred to herein as "Gypsum" or "Plaintiff." Commissioner Justin Jones is referred to herein as "Jones," "Mr. Jones," or "Commissioner Jones."

[2] Defendant Clark County is sometimes referred to as the "County." Defendant Clark County Board of Commissioners is referred to herein as the "Board" or "CCBC." The Board or CCBC and Clark County are collectively referred to as "Defendants."

**I. Background**

The parties to this action (Gypsum, Clark County, and CCBC) have been litigating the use of property purchased by Gypsum in 2003 (the "Property") for what is now approximately 18 years. The first suit was brought in 2005 by Gypsum against Clark County and the State of Nevada (the "State") challenging State statues and County ordinances that Defendants admit "effectively barred development on Gypsum's land." ECF No. 90 at 3. As the parties approached trial, the case was settled requiring, *inter alia*, the County to expressly proceed in good faith with the major project application (sometimes the "Application") Gypsum would submit for the Property. *Id. citing* ECF No. 56-1 at 7.[3]

Thereafter, Defendants admit Gypsum's Application was "tabled" by then-Commissioner Susan Brager, Commissioner for the district in which Gypsum's Property was located and the person who was, at that time, playing a significant role in determining when Gypsum's Application would be placed on the CCBC agenda. *Id*. at 4; ECF No. 55 at 5 (citation omitted). Gypsum also represents that a "pause" in the Application process was appropriate to allow the parties and the community to pursue a land exchange. ECF No. 36-2 at 111-12. *See also* 102-6 at 6-7. That is, despite language in the settlement agreement, the parties agreed Gypsum would attempt to trade its Property for other "developable" Bureau of Land Management ("BLM") land. ECF No. 90 at 4. Defendants admit that Commissioner Brager promised Gypsum she would move the major project application forward if the land swap did not occur. *Id*. (citation omitted). The land swap was unsuccessful and, in December 2016, Clark County sued Gypsum and an organization calling itself Save Red Rock (sometimes "SRR") in state court asking the court to find Gypsum's original Application expired. *Id*. at 4-5, 90-6 at 3. At this juncture Mr. Jones, not yet a County Commissioner, enters the picture as pro bono counsel for SRR.

In December 2016, Mr. Jones, then practicing law as a private citizen, sent a seven page evidentiary preservation letter (often referred to as a litigation hold) to the County requiring the County to "preserve any and all documents … in Clark County's possession, custody or control …

---

[3] The major project application was originally approved on August 17, 2011, but two requirements had to be met before development could commence. ECF No. 36-1 at 186-87.

relate[d] to Gypsum … and/or … SRR including, but not limited to" 224 separate document categories. ECF No. 55-49 at 2-4. The word "documents" was defined by Mr. Jones in a lengthy paragraph. *Id*. at 4. Among the many things included within the definition of "documents" was "text messages." *Id*.

In the course of the County's 2016 state court litigation against Gypsum and Save Red Rock, the County filed a motion for partial summary judgment in which Gypsum joined on February 2, 2017 (the "Joinder"). ECF No. 102-6 at 2. In its Joinder, Gypsum spoke of "bullying tactics" by SRR and its attempt to force the County to act in contrary to its express good faith bad faith obligations under the settlement agreement. *Id*. Nevertheless, on February 8, 2017, Gypsum told the state court "the County was complying" with the terms of the settlement agreement in "good faith." ECF No. 102-8 at 5. On February 22, 2017, Gypsum's representative told the CCBC that Gypsum "agreed to every condition" placed by the Board on its original concept plan for the Property.[4] ECF No. 35-6 at 111. Once the viability of the 2011 concept plan submitted by Gypsum was valid, the County contends "[t]he ball was in Gypsum's court" to meet the conditions to move forward with the process to develop its Property. ECF No. 102 at 12.

On October 18, 2018, Gypsum submitted a request to waive the two conditions preventing approval of its Property concept plan. ECF No. 36-2 at 201.[5] By this time, Mr. Jones, who was still representing SRR, was running for the Clark County Board of Commissioners—specifically, the seat that would be left open by Commissioner Brager who had previously promised to move Gypsum's major project application forward. On October 17, 2019, the day before Gypsum submitted its waiver request, the Nevada Current published an article in which Jones stated that, if elected, he would, "within his first 100 days" in office as a Clark County Commissioner, oppose Gypsum's application to develop its Property "and try to stop the project from proceeding."

---

[4] Submission of a concept plan is the first application step in the major projects process in Clark County's historical major projects process. ECF No. 55 at 4.

[5] The first waiver sought to modify the conditional approval of the August 2011 concept plan regarding access to State Route 159 so that language of the plan conformed to the language of the 2010 settlement agreement between Clark County and Gypsum. The second and key waiver that underlies this litigation (*see* ECF No. 102 at 8) pertained to the condition previously imposed by the Board for approval of the Gypsum concept plan. This waiver required Gypsum to obtain a right-of-way approval from the BLM for a primary access road to the proposed development prior to approval of a "Specific Plan." ("Condition 2").

https://www.nevadacurrent.com/2018/10/17/proposed-development-near-red-rock-looms-over-commission-race/. On October 31, 2017, Mr. Jones posed in a picture, in what is presumably his backyard, as a superhero identifying his "superpower" as "making compelling arguments for preservation and fending off … [his] arch-nemesis, Jim the Sprawl Developer." ECF Nos. 55-16, 55-30 (June 18, 2021 Decl. of Justin Jones) at 25 ¶ 6. There is no dispute that "Jim the Sprawl Developer" referenced Jim Rhodes, the Manager of Gypsum, the company seeking to develop land, which Jones was committed to preventing.

The events that occurred from there, before and after Mr. Jones won the election for Clark County Commissioner, form the heart of the instant Sanctions Motions. The Court finds two primary issues leading to the Sanctions Motions: (1) On April 17, 2021, just three hours after the CCBC voted to deny Gypsum's request to waive Condition 2 set by the Board in August 2011, which Gypsum had to meet before proceeding with a plan to develop its Property, and 105 days into Mr. Jones' role as a Clark County Commissioner, all text messages on Mr. Jones' personal cell phone were deleted; and (2) the CCBC took no action to preserve evidence regarding the allegations in the instant case until more than one year after Gypsum sued Clark County and CCBC for violation of federally protected constitutional rights and breach of the settlement agreement into which CCBC entered in 2010.

What is not in doubt is that less than three months before becoming a Clark County Commissioner, Jones communicated with Jim Ferrence (sometimes "Ferrence"), the campaign manager for then-Commissioner Steve Sisolak,[6] Chair of the CCBC, who was running for governor of Nevada. Jones emailed Ferrence about the then-pending litigation in which Save Red Rock, the entity Jones was representing, was both a defendant sued by and a counterclaimant asserting claims against the County. ECF No. 55-8. Specifically, at noon on October 21, 2018, Mr. Jones emailed Mr. Ferrence, stating "[y]esterday, the Court issued an order affirming Save Red Rock's standing to pursue its claim against the County and included some unflattering language about County Staff (referencing Commissioner Sisolak)." *Id.* at 2. Mr. Jones further stated he understood a board member for SRR spoke with and then emailed Commissioner Sisolak three days before Jones' email

[6] Commissioner and then-Governor Steve Sisolak is sometimes referred to herein as "Sisolak."

stating that if Mr. Sisolak would commit to vote against the waiver of conditions sought by Gypsum, SRR would send notice of the support to its entire email list, publish the same on social media, and, if desired, appear with Commissioner Sisolak expressing support for Sisolak's gubernatorial candidacy. *Id*. Mr. Jones reiterated this offer and added that if Commissioner Sisolak committed to denial of Gypsum's waiver request, Jones had SRR's authorization to stipulate to dismiss all claims against the County in the then-pending state court litigation. *Id*. Jones offered language Commissioner Sisolak could use in a public statement. *Id*. When Mr. Jones did not hear from Mr. Ferrence, he forwarded the email directly to Sisolak. ECF No. 56 at 107.[7]

The email was blind-copied to the head of the Nevada Conservation League, Andy Maggi. *Id*. It is through a subpoena to the Nevada Conservation League that Jones' messages to Ferrence and Sisolak discussed above (as well as several text messages) were discovered as all text messages on Mr. Jones' mobile phone predating April 17, 2019 at 6:09:34 p.m. were deleted. ECF No. 56 at 501; ECF No. 60 at 6. In one of these text messages, Mr. Maggi laments pressure he was getting from large donors to the Conservation League who wanted Sisolak to commit to voting against Gypsum's waiver. ECF No. 56 at 123-125. At close to 6 p.m. on October 21, 2018, Mr. Jones and Mr. Maggie discussed how they had heard nothing from Commissioner Sisolak's campaign, with Jones stating: "Well, I'm doing my part. If Sisolak doesn't want to play, then it[']s going to blow up in his face tomorrow." *Id*. at 123.

The next document the Court has is dated October 23, 2018, when Sisolak's campaign emailed Mr. Jones a draft of the public statement Sisolak would issue making clear he would "oppose waiving" the conditions imposed on Gypsum by the CCBC in 2011, and that he would not be part of a vote regarding Gypsum's waiver request until January when the two newly elected County Commissioners (one of whom was presumed to be Jones) would be on the Board. *Id*. at 127. Soon thereafter, as Mr. Jones promised, the litigation pending in state court against the County was dismissed. *Id*. at 137-38. At his deposition, Mr. Jones admitted the deal he struck with Commissioner Sisolak had "value," that Commissioner Sisolak used language similar to language

---

[7]     Jones also forwarded his email to Kami Dempsey, another individual involved in Mr. Sisolak's campaign for governor. *Id*. at 129.

Jones drafted when releasing his public statement, and that Commissioner Sisolak did what SRR and Jones wanted him to do. ECF No. 56 at 162-63.

What was fully communicated by Mr. Jones through texts, other than what is discussed above, is not available to the Court because there is no dispute that Mr. Jones' text messages were deleted on April 19, 2021 at approximately 6:09 p.m. To the extent communications are pieced together through production of documents in responses to subpoenas issued to individuals and entities other than Mr. Jones, the question remains what, if anything more, was communicated by Mr. Jones to Mr. Sisolak, those acting on his behalf of Mr. Sisolak, or to others about the deal to prevent approval of Gypsum's waiver.[8]

The next events of significance pertain to CCBC delays in voting on Gypsum's waiver requests. The County presents these delays as done purely at Gypsum's request. ECF No. 102 at 12 *citing* ECF No. 36-3 at 17 and 105. However, Gypsum tells a different story. Sometime before the scheduled December 5, 2018 CCBC meeting, and again before the scheduled January 23, 2019 CCBC meeting, CCBC staff reviewed and recommended approval of Gypsum's waiver request, and specifically recommended CCBC approve Gypsum's request to waive Condition 2 first set in August 2011. ECF Nos. 55-6 at 55-7. Subsequent to the two approval recommendations, an email produced by the County shows that at 2 a.m. on Friday, January 18, 2019 (fifteen days after Mr. Jones took the Clark County Commission seat previously held by Susan Brager[9]), the CCBC staff recommendation changed. ECF No. 55-19. Sami Real, the County Planning Manager, emailed Nancy Amundsen, Director of Clark County Comprehensive Planning,[10] the revised staff report no

---

[8] In an editorial in the Las Vegas Review Journal (the "RJ") appearing on November 10, 2018, the writer stated that only two days after Mr. Jones was elected to the Clark County Commission, "an environmental group that for years has been battling a proposed housing development on … [Gypsum's Property] overlooking Red Rock Canyon …, dropped its lawsuit against the project." ECF No. 90-19 at 1. After speaking to Mr. Jones, who said there was "a realization that resources would be better focused on telling the commissioners why the project doesn't make sense," the RJ editorial queries: "The change in tactics wouldn't have anything to do with Mr. Jones ascension to the [Clark County] board [of Commissioners], would it?" *Id*. at 2. In closing, the RJ editorial explains the controversy over the development of the land purchased by Gypsum "has dragged on for 15 years"; the land is not "environmentally sensitive" because the BLM did not want it when offered to do a land swap, and "if members of Save Red Rock think having their former counsel on the seven-member board will be enough to kill the … plan, they may be disappointed. Mr. Jones is hopelessly conflicted here and should recuse himself from any debate or vote on the issue." *Id*. at 2-3.

[9] Gypsum was assured by Commissioner Brager that she would vote in support of the waiver and the vote would happen after the November general election. ECF No. 55 at 5 and citations therein.

[10] *See* ECF No. 55-19 at 2.

longer recommending waiver of Condition 2. *Id*. The email cover to the changed recommendation stated: "In case you want some early morning reading." *Id*. After the 2 a.m. email on January 18, 2019, but on the same day, Gypsum sent a letter to Ms. Amundsen requesting consideration of its application that included the waiver requests be continued for 90 days to April 17, 2019. ECF No. 36-3 at 105. This was the second request to move the vote on the waiver requests. The first was made on December 3, 2018,[11] after Mr. Sisolak made clear there would be no vote on the waiver request until the two new County Commissioners were seated. By December 3, 2018, Jones was elected to the Board.

When Ms. Real was asked at her June 9, 2021 deposition why the recommendations changed from approval to denial of the waiver request, she stated: "I don't recall why. … I don't recall what discussions … took place to lead up to that." ECF No. 55-18 at 9. Counsel for Gypsum attempted to get more information from Ms. Real, but she did not recall with whom she spoke except she believed she would have talked with Ms. Amundsen. *Id*. at 10. Otherwise, Ms. Real did not know "if anybody asked for the changes to be made." *Id*. Ms. Real also stated she did not communicate directly with County Commissioners and did not know who would have communicated direction from the Commissioners to her. *Id*. at 11. Ms. Real admitted she had signed off on the staff reports initially recommending approval of Gypsum's requested waiver, (*id*. at 12), she did not recall telling anyone she disagreed with the original staff recommendations (*id*. at 12-13), and did not know what prompted the criticism of the Gypsum specific plan sent at 2 a.m. on January 18, 2019. *Id*. at 13. Ms. Real also testified that she did not "know what prompted … [the changed recommendation], but" contended that "sometimes that if something lingers long – lingers enough, long enough, around long, that maybe it was just done to truth-check what was in there." *Id*. Ms. Real also said she did not "know what led … [her] to all of a sudden just go in and relook to see where there were inconsistencies" and could point to nothing other than the fact that Mr. Jones was now a Clark County Commissioner and her own curiosity that might have prompted her to do so. *Id*. at 14.

Approximately 18 months later the County submitted a Declaration signed by Ms. Real dated February 9, 2023, in which she stated: "I absolutely would remember if Commissioner Justin Jones

[11] ECF No. 36-3 at 17.

directed me to change the Gypsum Waiver Application staff report and recommendation – this did not happen." ECF No. 102-13 ¶ 4. Ms. Real also said the staff report and recommendations given to the CCBC as part of Gypsum's waiver application heard on April 17, 2019 "had nothing to do with any direction … [she] received from Commissioner Justin Jones." *Id.* ¶ 5. No explanation for the new memory was offered to the Court.

By January 18, 2019, Mr. Jones had replaced Commissioner Brager on the CCBC and was now the Commissioner representing the district that included Gypsum's Property on which SRR had opposed development, CCBC had revised staff recommendations (recommending the Commissioner deny waiver of Condition 2), and Mr. Sisolak was elected Governor of Nevada. On April 17, 2023, the Board, including Mr. Jones (who had received the go ahead to cast a vote from the State Ethics Commission so long as he "disclosed all information which … [he] believed was relevant to their assessment" of his potential conflict arising from representation of SRR[12]) voted unanimously to deny waiver of Condition 2. The vote concluded at 2:56:12 p.m. ECF No. 56 at 248 (Ex. 23). By 6:09 p.m. all text messages on Mr. Jones' personal phone, which he was using as a Clark County Commissioner, predating that time and date were deleted. ECF No. 56 at 501 (Ex. 38).

Gypsum sued the County on May 19, 2019. ECF No. 1. No litigation hold process was put in place by Clark County until August 17, 2020. ECF No. 55-41. The Clark County Commissioners deposed all testified they were not asked to search for any electronic documents or have not been instructed to cease destruction of electronic documents until, in some cases, shortly before their depositions. ECF Nos. 55-17 at 13; 55-43 at 7; 55-44 at 9; 55-45 at 7; 55-46 at 7.

## II. The Parties Arguments

### A. Gypsum's Motion for Sanctions Against Commissioner Jones.

#### *1. Gypsum's Motion*

The sum and substance of Gypsum's Motion against Jones argues (1) Commissioner Jones purposely deleted all text messages from his phone approximately three hours after the CCBC voted to deny waiver of Condition 2 to Gypsum, (2) this deletion was done by Jones knowing litigation

[12] *See* ECF No. 55-30. The Court notes Findings of Fact contained in the Ethics Commissions' Opinion do not reflect Mr. Jones revealed his communications or agreement of value with Commissioner Sisolak regarding Gypsum's waiver application.

was reasonably foreseeable, (3) the deletion was done intending to destroy evidence relevant to foreseeable litigation, and (4) Mr. Jones subsequently and intentionally misled this Court (and previously the Bankruptcy Court) regarding what he had done. ECF No. 82 (*see also* ECF No. 55). Gypsum points to Mr. Jones' deposition on April 23, 2021 during which he was asked what happened to all of his text messages predating November 2019—the first date on which Mr. Jones said his phone still showed text messages. Mr. Jones testified he could not say because he is not "a technology person" and could only say that his phone had "text messages from November 2019." ECF No. 55-17 at 13. When asked to confirm that all text messages with Mr. Ferrence, Mr. Sisolak's campaign manager in 2018, were deleted, Mr. Jones stated "all I know is that I – my phone currently has my texts from November 2019. I don't know whether they have been deleted or not." *Id*. at 14-15. When Mr. Jones was asked whether he had preserved all personal documents for the period of time before he was elected to CCBC, Mr. Jones stated "As far as I know." ECF No. 82-1 at 15. When asked if he had taken any steps to preserve electronic evidence since the instant lawsuit began, Mr. Jones responded that Gmail keeps documents, specifically, emails, indefinitely. *Id*. When the question was clarified to reflect preservation of text messages, Mr. Jones said: "I assume that I have text messages. I'm not aware of whether they are preserved or not." *Id*. Mr. Jones (a lawyer who prepared and sent a detailed preservation notice to the County in 2016) admitted he understood preservation of electronic communication when litigation is occurring, but stated he took no steps to preserve documents because he was not a party to the litigation and was not asked to do so. *Id*. at 15-16.

On June 18, 2021, Mr. Jones opposed a motion then pending in the U.S. Bankruptcy Court in Nevada that sought to compel documents from the County. ECF No. 82 at 7 *citing* ECF No. 55-30. Mr. Jones equated Gypsum's discovery efforts to a child's tantrum and stated, in his attached declaration (the first of two) in opposition to the motion to compel, that his work to save Red Rock was his "passion," his conduct was ethical, and the April 2019 vote by the Board was based on the recommendation of Clark County Comprehensive Planning and Public Works staff. ECF No. 55-30 at 25-29. Mr. Jones' declaration said nothing about the changed recommendation to deny Gypsum's waivers distributed by Ms. Real at 2 a.m. on January 18, 2019 after two prior reports from

the CCBC staff recommending approval of the waivers; that this change occurred just 15 days after Mr. Jones was seated as a County Commissioner; that Mr. Jones communicated with Mr. Sisolak and his campaign to obtain a promise from Sisolak that he would vote against the waiver Gypsum wanted in response to promises that Save Red Rock would publicly support his campaign and dismiss a then pending lawsuit against the County; or that part of what Sisolak provided to Jones was the announcement that Sisolak would delay the vote on Gypsum's waiver requests until after the newly elected Commissioners (one of whom would be Jones) were seated on the Commission. ECF No. 56 at 127.

Because the County could not require Jones to produce documents pre-dating his January 3, 2019 swearing in as a County Commissioner Gypsum subpoenaed documents from Mr. Jones personally and his then-law firm Jones Lovelock on April 29, 2021.  ECF No. 82 at 8.  There is no doubt these subpoenas did not result in the production of text messages pre-dating April 17, 2019 at 6:09 p.m.  On September 1, 2021, Mr. Jones signed a second declaration stating (1) his "preferred means of" communication was his iPhone, (2) the phone contained attorney client privileged emails and text messages, (3) he had responded to Gypsum's subpoenas producing "several categories of document, including, but not limited to, … text messages … for the requested period of January 1, 2021 to present" despite objections to the subpoena served on him personally, (4) he had logged onto his iCloud account to search for any additional text messages, (5) he took his responsibility to respond to the subpoenas seriously, and (6) he took "great offense at the continued attacks by Gypsum[]" because the attacks were "baseless" as he had not engaged in a "pattern of delay, obfuscation and concealment."  ECF No. 55-32 at 18-22 discussed at ECF No. 82 at 9-10.

Ultimately, as the parties know, the Bankruptcy Court ordered Mr. Jones' cell phone and iCloud account to be forensically imaged and examined.  ECF Nos. 55-27, 55-33 (over objection by Mr. Jones).  The forensic examination "confirmed … there were no text messages accessible on Jones' cell phone or iCloud account prior to April 17, 2019, regardless of whether it hit on a search term.  [The examiner]… also stated that the first text message that remains on the phone was sent at 6:09:34 PM on April 17, 2019."  ECF No. 55-35 ¶ 11; *see also* ECF No. 55-38.

Gypsum contends these facts demonstrate that litigation was reasonably foreseeable to Jones because: (1) there is no other reason for all text messages predating the April 17, 2019 vote to deny waiver of Condition 2 to be deleted from Jones' phone, which deletion occurred after Jones was a Clark County Commissioner; (2) no alternative explanation for the deletion was offered at any time by Mr. Jones or the County; (3) "Jones, more than anyone else, knew of all the behind-the-scenes maneuvering he had engage in to secure delay of the vote [on Gypsum's waiver request] until after he was sworn in" as a County Commissioner; (4) Jones, as SRR's counsel, offered an opinion on the value of Gypsum's Property suggesting the land use approvals Gypsum sought "would increase the value of the property by more than 400%, a $150+ million giveaway to Rhodes [manager of Gypsum]"; (5) Jones understood the importance and detailed nature of evidence preservation as demonstrated by the 2016 preservation letter he prepared and sent to Clark County; (6) during Jones' campaign for Clark County Commissioner, he acknowledged Gypsum's active desire to move forward with developing its Property and stated he would try to stop that development within his first 100 days in office; and (7) Jones understood the "paralyzing fear" the County and staff expressed regarding "being hit with litigation." ECF No. 82 at 11-13 (internal citations omitted).

Gypsum argues the Court has inherent authority to sanction Jones based on Jones' drawn out deception visited upon the Court. *Id*. at 13-17. Gypsum says Jones is not an ordinary witness in this case, but a lawyer and elected "official charged with public trust." *Id*. at 15. Jones, as a licensed Nevada lawyer, had duties under law to be candid with the Court even when in a role as a witness. *Id*. at 15-16. Gypsum argues Jones foresaw litigation, but even if he did not, the Court may sanction him for multiplying and delaying proceedings. *Id*. at 17. Gypsum asks the Court to grant attorneys' fees and fines, and report Mr. Jones' misconduct to the Bar. *Id*. at 18-20.

2. *Mr. Jones' Opposition to Gypsum's Motion*.

Mr. Jones contends Gypsum has "carefully and meticulously manipulated the facts" in an effort to obtain sanctions against him. ECF No. 83 at 2. Breaking down those facts, Jones says he took office on January 3, 2019, which means that only some of the texts (no longer available) on his cell phone were public record. *Id*. at 3. Mr. Jones argues the CCBC vote on April 17, 2019 to deny Gypsum's waiver of Condition 2 was unanimous and adopted the recommendation of Clark County

staff. *Id*. The litigation filed a month after the vote did not name Jones, and neither Mr. Jones nor the County were put on notice that Gypsum intended to file suit regarding the Condition 2 waiver denial before that date. *Id*. Mr. Jones' deposition in April 2021, for which he appeared voluntarily, is misconstrued by Gypsum to "frame Jones' testimony as 'false' and 'designed to deceive.'" *Id*. According to Jones, his testimony shows he stated he was "unsure what happened to" all the text messages (that disappeared just three hours after the CCBC voted to deny Gypsum's waiver request of Condition 2). *Id*. at 3-4. Reiterating statements made to the Bankruptcy Court, Jones contends he was factually honest when he stated his "phone currently" had texts from November 2019 forward. *Id*. at 4. Mr. Jones points out he testified in April 2021 that text messages before November 2019 were not on his phone and that he did not know if messages prior to that time were preserved. *Id*.; ECF No. 82-1 at 20-21.

Mr. Jones describes subpoenas issued to him, his law firm, and his family members by Gypsum as a "witch-hunt." ECF No. 83 at 4. Citing Mr. Jones' opposition to Gypsum's Motion to Compel in Bankruptcy Court, which ultimately led to the forensic imaging of Mr. Jones' personal phone he used for communicating while a Clark County Commissioner, Mr. Jones argues he was dragged into this litigation by Gypsum. *Id*. at 4-5.

Mr. Jones argues Rule 37 sanctions for spoliation of electronically stored information do not apply and eliminates the Court's inherent power to sanction. Mr. Jones also argues that litigation was not reasonably foreseeable on April 17, 2019 following a unanimous vote by the CCBC to deny a single waiver request Gypsum agreed to years earlier. *Id*. at 9-10. Jones says he testified to the best of his knowledge in June 2021, the duty to preserve "was not triggered until" the litigation was filed on May 17, 2019, and the deleted messages in dispute "were likely a small percentage of the messages on Jones' personal cell phone" because, Jones seems to contend, only those messages that were deleted after he became a County Commissioner are at issue. *Id*. at 9-10.

Mr. Jones also argues Gypsum fails to demonstrate prejudice as a result of the lost text messages (only those that were public records after Jones became a County Commissioner), a requirement to finding spoliation. *Id*. at 10-11. In a single sentence, without citations, Jones says Gypsum "received the messages … [it] was requesting from other sources." *Id*. at 11. In another

single sentence Jones concludes the deleted messages are not relevant to this case because they "occurred prior to Jones taking office." *Id*. at 12. Jones contends he had "no affirmative duty" to preserve text messages before he became a County Commissioner. *Id*.

Mr. Jones contends the Court should not sanction him using its inherent authority because the Court must find an abusive litigation tactic amounting to bad faith or improper motive to do so. *Id*. If the Court decides to the contrary, Mr. Jones states the Court must "make explicit, detailed findings that Jones' action were done in bad faith or for an improper purpose to defraud this Court." *Id*. at 13. Jones says he appeared and testified in good faith and responded to subpoenas in good faith. *Id*. at 14-15. Finally, Jones argues that even if sanctions are granted, Gypsum's request is unreasonable, Gypsum fails to demonstrate how "Jones' alleged deception" caused prejudice, "Plaintiff and Jim Rhodes have demonstrated a clear vendetta against Jones," Jones violated no ethical rules, and sanctions would be a form of punitive damages inappropriate in this circumstance. *Id*. at 16-18.

*3. Gypsum's Reply.*

In Reply Gypsum points to the long running litigation and discussions with Clark County regarding Gypsum's use of the Property, which, beginning no later than in 2016, included Mr. Jones as counsel for Save Red Rock—an organization dedicated to stopping Gypsum's development plans. ECF No. 87 at 2. Gypsum argues Jones, as SRR's lawyer, "orchestrated" a plan to obtain then-Commissioner Sisolak's commitment to vote against Gypsum's waiver request, which was headed to a CCBC vote on December 5, 2018, for which Sisolak would receive campaign support and dismissal of what Jones had described as an "uncomfortable lawsuit" for Sisolak. *Id*. *citing* ECF No. 56 at 107 (the October 21, 2018 email from Jones to Mr. Sisolak's campaign manager describing the lawsuit then headed to trial as one "likely [to] be uncomfortable for Commissioner Sisolak."). Gypsum says this background demonstrates the instant lawsuit is "hardly about" only "a single inconsequential vote in April, 2019." *Id*. at 3. Gypsum says Jones used his time after becoming Commissioner to "co-opt" the County staff's review process resulting in the staff reversing its twice given recommendation to approve Gypsum's waiver requests to a recommendation to deny the waiver requests. *Id*.

Gypsum says Jones fails to "deny" he anticipated litigation as a result of the April 17, 2019 vote, arguing instead that litigation was not reasonably foreseeable. Gypsum cites to the Las Vegas Review Journal editorial stating Jones was hopelessly conflicted and should recuse himself from any vote regarding Gypsum's Property (*infra* n.8) and to the Ethics Commission's report noting Commissioner Brager and the Assistant District Attorney found Jones was conflicted and should not vote on matters involving Gypsum. ECF No. 87-3 at 4-5.

The Nevada Commission on Ethics Findings of Fact No. 16, regarding whether Jones had a conflict, states Jones told the Commission: "SRR previously opposed and is currently opposing the … [the waivers] to be heard at the January 23, 2019 meeting." *Id*. at 4. The Ethics Commission report also states "Jones did not represent SRR in opposing these matters. Jones has communicated with SRR activists as his friends and/or constituents and Red Rock Canyon continues to be an issue he cares about." *Id*. In contrast to the statement to the Commission on Ethics, Jones testified at deposition that Gypsum's waivers were certainly of interest to SRR in the 2016 litigation filed by the County against Gypsum and SRR because the waivers were "related to the claims and defenses in the case" on which Jones was counsel. ECF No. 87-4 at 8-9. Gypsum contends Jones did not share his contacts with then-Commissioner Sisolak because he "foresaw the inevitable litigation over his pre-election promise to defeat Gypsum's development plan in his first 100 days." ECF No. 87 at 5. Gypsum cites the deposition of Gypsum's lobbyist Jay Brown who testified at the end of 2018, the development of Gypsum's Property was "really a litigation matter" in which he was not involved. ECF No. 87-7 at 6-7.

Gypsum also reiterates its position that Mr. Jones had a duty to preserve evidence not just once he became a County Commissioner, which duty arises under Nevada law, but also before because he is not a disinterested third party, but the lawyer for Save Red Rock who led the charge to stop Gypsum's development of the Property. ECF No. 87 at 5-7. And Gypsum says Jones did not only delete text messages during the time period before he became a County Commissioner, but also after he assumed elected office. *Id*. at 8 *citing* ECF No. 56-50. Gypsum closes this argument by contending Jones sought to sabotage the settlement agreement with the County, in which the County agreed to consider Gypsum's Property development in good faith, by entering into a "corrupt

bargain with the former Commission Chairman" Steve Sisolak to deny the critical waiver Gypsum sought, he succeeded in his mission, and he subsequently attempted to destroy the evidence of his actions. *Id*. at 9.

B. Gypsum's Motion for Sanctions Against Defendants.

*1. Gypsum's Motion*.

Gypsum's Motion against Defendants begins by discussing the settlement of the 2005 litigation in which Gypsum sued the State and the County challenging statutes and ordinances effectively barring development of Gypsum's Property. ECF No. 90 at 3. There is no dispute the settlement expressly required the County to process Gypsum's major projects application in good faith. *Id*. After attempting and failing to find a land swap with BLM, a second lawsuit was filed by the County (the 2016 litigation). *Id.* Gypsum contends this history (1) ultimately led to Jones' involvement with Save Red Rock, (2) his communications with then-Commissioner and candidate Sisolak, and (3) the corrupt deal between then-Clark County Commission candidate Jones—who was running for the seat in which the Gypsum Property was located—and Sisolak, who was running for governor, in which Sisolak's support for refusing Gypsum's waiver of Condition 2 was swapped for campaign support and dismissal of the 2016 litigation painting Sisolak in a bad light. *Id.* at 5.

Gypsum cites Chapters 239 of the Nevada Administrative Code ("NAC") and the Nevada Revised Statute ("NRS") that govern document destruction by public entities. The NAC allows adoption of the Local Government Records Program Manual (containing a General Schedule regarding record retention) by any Nevada County thereby satisfying the record retention schedule required under Nevada law. ECF No. 90 at 6 *citing* NAC 239.155(1)(b), (5). Gypsum explains the General Schedule is 443 pages long and effectively defines texts and emails pertaining to Clark County Commission business as executive correspondence that must be permanently retained. *Id*. at 7 *citing* the Local Government Records Retention Schedule found at http://nsla.nv.gov/Id.php?content_id=60238524.

Gypsum argues it is obvious that documents residing on the private cell phones of County Commissioners and staff are public records. *Id*. Gypsum cites the March 29, 2018 *Comstock Residents Ass'n v. Lyon Cnty. Bd. of Comm'rs*, decision in which the Nevada Supreme Court

unanimously held "records of communications regarding the zoning change in Lyon County exist on the commissioners' private phones and servers, communications made in the performance of the commissioners' duties on behalf of the public fall within this definition of a public service." 414 P.3d 318, 322 (Nev. 2018). The Court in *Comstock* further stated: "a record within the possession of a private entity may still constitute a public record subject to disclosure upon request. [Citations omitted] …. It does not follow, then, that a public record is inherently beyond the control of a governmental entity by virtue of the fact that it exists on a device or server not designated as governmental. While Lyon County does not provide the subject phones or email accounts, the commissioners themselves are governmental entities, … and their custody of the requested records would satisfy the requirement of legal custody under NRS 239.010(4)." *Id*. at 323.[13]

Gypsum says Clark County did nothing to preserve public records pertaining to the issues being litigated in this case (ECF No. 90 at 8) and this failure was a violation of the County's document retention policy requiring record retention "in compliance with applicable laws and regulations." *Id citing* 90-10 (the Clark County's Records and Information Management (RIM) Policy). The policy reaches "employees," which is defined as including elected officials. *Id*.

Gypsum also cites to its Exhibit 12 (found at ECF No. 91) containing a large sample of text messages by and between County Commissioners and County staff as evidence that County employees regularly used text messages; however, in response to Gypsum's request for the County's policy pertaining to preservation of text messages, the County produced nothing. ECF No. 90. at 9 *citing* ECF No. 90-13. Ultimately, however, the County did produce text messages for one employee, Meggan Holzer, who testified she never altered her phone's pre-set auto-delete function, this may have resulted in the loss of some text messages, she did not know she was supposed to preserve anything until shortly before her deposition (which took place on May 13, 2021), but she thought her text messages went back to 2017 or 18. ECF No. 90-14 at 9 through 15.

---

13 The March 2018 *Comstock* decision was long before any destruction or spoliation of text messages occurred in this case. Further, the Nevada Supreme Court held: "On its face, NRS 239.010(1) does not state that only records maintained in government offices constitute public records" and "[t]he use of private entities in the provision of public services must not deprive members of the public access to inspect and copy books and records relating to the provision of those services. NRS 239.001(4)." *Id.* at 321.

Gypsum contends the County admits foreseeability of the instant litigation by arguing its litigation hold relating to the 2016 litigation (despite dismissal in November 2018) was still in effect on April 17, 2019, and, essentially, no further litigation hold was issued by the County for another year because the 2016 litigation was sufficient and effective for purposes of preserving documents related to the instant litigation.  ECF No. 90 at 10 *citing* 90-7 at 5-9.  When the Court asked additional questions at oral argument, the County also offered that it did not issue a litigation hold because review of CCBC's decision to deny the waiver of Condition 2 was limited to "judicial review" on the record, in which case text messages would be irrelevant.  *Id*. at 9-10.

Gypsum says that before the April 17, 2019 vote, the same Assistant District Attorney signed off on the November 2018 dismissal of the 2016 litigation involving the County and Gypsum (despite no vote by the County Commission approving the dismissal) and determined Jones should be disqualified from involvement in Gypsum's land use matters.  ECF No. 90 at 10-11 *citing* ECF Nos. 90-1 at 9-10; 90-16 at 8.  Gypsum adds the County and its staff knew the recommendation to approve Gypsum's waiver of Condition 2 changed to a recommendation to deny the waiver soon after Jones became a Commissioner in January 2019, which was not long after the Review Journal stated Jones was hopelessly conflicted on Gypsum matters.  *Id*. at 11 *citing* ECF Nos. 90-17, 90-19.  Gypsum cites Clark County procedures requiring Commissioners and County staff to delete no records until the formal lifting of a litigation hold.  ECF No. 90-8.  Finally, when the County did issue a litigation hold, the hold was not sent to County Commissioners.  ECF No. 90 at 12 *citing* ECF No. 90-20.

Gypsum argues sanctions are warranted under Fed. R. Civ. P. 37(e) given the County's failure to preserve evidence in violation of NAC 239.155, its own policy, and in the absence of good faith.  *Id*. at 13.  By March 2018, the Supreme Court of Nevada made clear public records include information maintained on Commissioners' private cell phones.  *Id*. at 14 *citing Comstock*, 414 P.3d. at 320.  Gypsum cites law holding the County's failure to implement and follow a document retention policy may constitute spoliation in and of itself.  *Id*. at 14-15 (citations omitted).  In sum, Gypsum contends the County did nothing to preserve text messages at any time.  *Id*. at 16.  Gypsum closes this section of its Motion stating that Mr. "Jones' ability to destroy public records just hours after

the April 17, 2019 vote … [was] a direct result of the County's derelict policies and procedures." *Id*. at 17.

With respect to prejudice, Gypsum points to "the extraordinary lengths" it went through to secure texts from others. Gypsum cites Exhibits 56-9, 56-11, and 56-14, which are texts recovered through subpoenas to the Nevada Conservation League and from Commissioner Sisolak's campaign. ECF No. 90 at 19. As good as this information is, Gypsum argues "most all of Jones' texts from the critical period of his joining the Commission until the fateful April 2019 vote were intentionally destroyed," as were the texts of other Commissioners and County staff. *Id*. Gypsum points out that this includes the time period when Commission staff changed its recommendations from approving Gypsum's waiver to recommending denying the waiver. *Id*. at 19-20. Absent the County's failure to take appropriate steps to preserve this electronic evidence, these communications would be available and would likely "show the true extent and nature of the efforts to undermine Gypsum's rights." *Id*. at 20.

2. *Defendants' Opposition to Gypsum's Motion for Sanctions*.

Defendants argue litigation was not foreseeable after the unanimous April 17, 2019 vote to deny Gypsum's request to waive Condition 2, Defendants did not foresee that Commissioner Jones' personal mobile phone would contain information relevant to a future suit, Gypsum has repeatedly acknowledged it was bound by Condition 2, the County could not have caused deletion of Jones' texts when it did not know they existed, and "it is still unreasonable to impose a duty to secure an elected official's personal device." ECF No. 102 at 2. Defendants argue the "only plausible legal action of a denial of a reconsideration application would be through a petition for judicial review" and that, therefore, the County had no notice of litigation until May 2019 when Gypsum filed suit. *Id*. at 2-3. Defendants further argue Gypsum contradicts itself when it says the County's preservation policies are broad enough to reach Commissioner Jones, but the County "should be sanctioned for not updating its policies to include texts in 2018." *Id*. at 3.

Defendants argue no relevant data from mobile phones was destroyed. *Id*. at 4. Referencing Gypsum's Exhibit 12, which is a response to a public records request for texts between County Commissioners and staff, Defendants contend the documents show nothing relevant was destroyed

because the texts do not discuss Commission agenda items or policies.[14] *Id*. Defendants conclude there is no basis to assume relevant texts were destroyed. Defendants parlay this into a discussion of Commissioners who only took office approximately three months before the April vote all of whom, other than Jones, testified that they had no discussions about Gypsum on their phones. *Id*. at 5. Defendants further offer that the two Commissioners not newly elected who were opposed to the Gypsum development plan were not deposed by Gypsum. *Id*. at 6.

Defendants contend an attorney for Gypsum who responded to a discovery subpoena in this action, but did not produce text messages "involving Gypsum" despite admitting he uses texts when communicating with CCBC, means Gypsum's attorney did not foresee the instant litigation. *Id*. at 6-7. Defendants concede "it is circumstantial evidence that" Gypsum's counsel ever had any relevant data on his mobile phone; nevertheless, Defendants contend the evidence that he did "is markedly stronger than" Gypsum's contention that County Commissioners, other than Jones, supposedly had and failed to preserve discoverable data. *Id*. at 7. Gypsum points to another attorney/agent who worked for Gypsum that also allegedly did not preserve texts because he was not asked to do so before April 17, 2019 or any time after. *Id*.

Defendants next argue that Gypsum's spoliation motion is tardy given it did not seek to discover texts from Commissioners other than Jones and instead only asked these Commissioners at deposition whether they had Gypsum-related texts. *Id*. at 8. This, Defendants contend, along with a failure to meet and confer or a motion to compel, demonstrates delay by Gypsum that precludes a finding of spoliation. *Id*.

Moving to an argument regarding the foreseeability of § 1983 litigation, Defendants argue Gypsum did not meet its burden to affirmatively prove "Clark County should have acted immediately after the meeting on April 17, 2019 to secure and store information held on Commissioner Jones' personal phone …." *Id*. Arguing no pre-litigation hold obligation, Defendants reiterate that Gypsum historically agreed to Condition 2, Gypsum pursued the land exchange with BLM, Gypsum requested two extensions of time before the vote on the waiver occurred, and Gypsum "has not obtained any right to develop the" Property. *Id*. Defendants say there is no duty

[14] The earliest date on these exchanges appears to be August 2019.

to issue a litigation hold "minutes after a unanimous vote to maintain the key condition imposed by the 2011 Board." *Id*. (citation omitted).  Citing a 2011 Board meeting and exchange between Commissioner Brager, whose seat Jones filled, and an attorney for Gypsum, Defendants quote Brager regarding Condition 2 and the Board's vote to approve Gypsum's concept plan by a 5 to 2 vote. *Id*. at 9.  Defendants then go through the history of the agreed upon attempt to obtain a land swap (which did not pan out) and the 2016 litigation, Gypsum's stated agreement to Condition 2, Gypsum's initial filing requesting waiver of Condition 2 on October 18, 2018, and Gypsum's requests for extensions of consideration of that waiver in December 2018 and January 2019. *Id*. at 9-12.  After the vote to deny the waiver, Defendants did not tell the County it was going to seek judicial review of the decision and did not serve the County with a litigation hold letter. *Id*.

While Defendants agree "[i]t would be fair to say Commissioner Jones ran on a platform of environmental protections, particularly Red Rock Canyon, and represented the public interest group SRR[,] … there is no evidence Clark County had any notice that Commissioner Jones was doing anything other than representing his constituency prior to and after April 2017." *Id*.  Defendants contend there is no reason Clark County officials would, when viewed objectively, have "ever draw[n] the conclusion that Gypsum" was likely to sue immediately after a unanimous vote to confirm a condition first imposed on Gypsum in 2011. *Id*. at 14.  Citing to the CCBC's Board Agenda Sheet for the April 17, 2019 Board meeting, Defendants say the unanimous vote was in line with public sentiment and recommendation of the staff. *Id*. at 15 *citing* ECF No. 36-3 at 188. Defendants also cite the Nevada Ethics Commission's finding Jones could vote on Gypsum related matters and Gypsum's failure to object during the April 2019 meeting. *Id*. *citing* ECF Nos. 36-3 at 124; 90-15.

Defendants contend Gypsum has not met its burden of showing "that Clark County reasonably should have determined that Commissioner Jones' phone should have been taken from him and imaged immediately after the public meeting." ECF No. 102 at 16.  Hindsight, Defendants say, is not the proper analytic framework applied to foreseeability. *Id*. (citation omitted).  In this same vein, Defendants argue Commissioner Jones understood his obligation to preserve evidence, but this does not support the conclusion that the County's failure (if any) caused the loss of Jones'

texts a mere three hours after the April 17, 2019 meeting. *Id*. at 17. The County then says that Jones' "actions, as alleged, were knowingly done against policy." *Id*.

Defendants argue Commissioner Jones' intentional misconduct cannot be imputed to Clark County because the unrecoverable texts were not in its custody. *Id*. at 18. The County says Jones was not acting as its agent and the spoliation allegations are inconsistent with the County's policies. *Id*. Citing case law, Clark County says Commissioner Jones was not its legal or practical equivalent, was not a final policy maker by himself, and did not act as an agent with the consensus of CCBC. *Id*. at 19. Defendants argue there is no evidence the County's policies played any role in the deletion of texts from Mr. Jones' phone that were always in his possession. *Id*. The County also argues that while there is no case on point, there are cases demonstrating constraints on imposing monetary sanctions against a local governmental entity "in these unique circumstances." *Id*. at 20-21.

Defendants further argue no irreplaceable, relevant evidence was destroyed. *Id*. at 21. Defendants return to the argument, previously rejected by the Court, that the County's alleged breach of contract and breach of good faith and fair dealing are not governed by contract law, but by the arbitrary and capricious standard. *Id*. at 22 (no law citations offered). Defendants also say any duty it may have owed to Gypsum was "tempered by the duty [Defendants] … owes to the public …." *Id*. Defendants close their Opposition stating: "An impermissible motive or interest that might be suggested by Commissioner Jones' text messages does not make any Clark County act more or less objectively arbitrary or capricious. Thus, Gypsum in not prejudiced from the loss of text messages of one Commissioner that might suggest bias, retaliation or an improper motive." *Id*. 24.

*3. Gypsum's Reply.*

In Reply, Gypsum argues Defendants (1) ignore their statutory obligations to preserve public records as well as their duty under Fed. R. Civ. P. 37(e), (2) fail to explain why they did not preserve records in light of their legal obligations to do so, and (3) get the facts wrong regarding when Gypsum first sought discovery of text messages (January 2020). ECF No. 107 at 2-6. Gypsum says Defendants admit the destruction of text messages by Commissioner Jones was against County policy, do not dispute that no litigation hold was issued until August 2020—fifteen months after Gypsum filed suit, the litigation hold was silent with respect to text messages, and the hold notice

did not go to County Commissioners. *Id*. at 6-7. Gypsum recognizes Rule 37(e) does not require perfection, but argues the County's conduct was egregious in its failures. *Id*. at 7.

Gypsum contends Defendants had a duty irrespective of foreseeability, a duty Defendants never fulfilled. *Id*. at 8. While Gypsum may have agreed to Condition 2, Gypsum argues it made significant and long standing efforts to modify the Condition. *Id*. *citing* ECF No. 104. As for alignment with the County during the 2016 litigation, Gypsum questions how this would relieve Defendants of their obligation to preserve evidence. *Id*. Likewise, Defendants never explain the last minute change in the staff recommendation from approving to denying the waiver of Condition 2. *Id*. at 8-9.

Gypsum says the relevance of and therefore prejudice arising from lost text communications are obvious. *Id*. at 9. Finally, Gypsum says Defendants are responsible for the lack of preservation because it failed to take any steps to ensure relevant evidence was not lost or destroyed. *Id*. at 10. Citing clear state law, which the County does not dispute, Gypsum argues there is no "plausible explanation" for Defendants' failure to fulfill its obligations associated with this case.

## III. Discussion

### A. The Inherent Authority to Sanction Applied to Commissioner Jones.

The Ninth Circuit recognizes a district court's inherent authority to sanction nonparties "for abusive litigation practices." *Indiezone, Inc. v. Rooke*, 720 Fed. Appx. 333, 337 (9th Cir. 2017) (nonparty CEO found to be the source of bad faith and who disobeyed a court order was properly sanctioned) (internal citation omitted). *See also Corder v. Howard Johnson & Co.,* 53 F.3d 225, 232 (9th Cir. 1994) ("[E]ven in the absence of statutory authority, a court may impose attorneys' fees against a nonparty as an exercise of the court's inherent authority to impose sanctions to curb abusive litigation tactics." (citation omitted)). Before imposing sanctions on a nonparty, the Court must make an explicit finding of bad faith or improper purpose. *Knupfer v. Lindblade (In re Dyer),* 322 F.3d 1178, 1196-97 (9th Cir. 2003) (citation omitted).

Litigation "tactics undertaken with the intent to increase expenses, or delay, may … support a finding of bad faith." *New Alaska Dev. Corp. v. Guetschow,* 869 F.2d 1298, 1306 (9th Cir.

1989) (referring to 28 U.S.C. § 1927[15]). The Ninth Circuit stated: "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument or argues a meritorious claim for the purpose of harassing an opponent"). *Id.* (internal citations omitted); *Gomez v. Vernon,* 255 F.3d 1118, 1134 (9th Cir. 2001) ("Recklessness, when combined with an additional factor such as frivolousness, harassment, or an improper purpose, may support sanctions"); *Chambers v. NASCO, Inc.,* 501 U.S. 32, 50–51 (1991) (affirming a district court's imposition of sanctions on an individual for conduct before other tribunals that constituted abuse of process, even though the individual was not a party at the time he committed the abuse of process and, thus, was beyond the reach of the federal rules).

Here, many facts related to Commissioner Jones and the text messages that disappeared from his phone at approximately 6:09 p.m. on April 17, 2019—three hours after the vote to deny Gypsum's waiver of Condition 2—are undisputed and lead the Court to infer an improper motive that supports sanctions. That is, there is no dispute that texts on Commissioner Jones' personal mobile phone prior to 6:09 p.m. on April 17, 2019 are unavailable through an examination of his phone or iCloud account. Despite the number of filings around the disappearance of these texts, Jones has never contended someone else caused the deletion, he did so accidentally, or that there was some unexpected and inexplicable computer event that resulted in all texts, with a date and time prior to 6:09 p.m. on April 17, 2019, being deleted from a device in his control or from his iCloud account. Clark County also produced no texts that ever resided on any mobile phone belonging to Mr. Jones with a date and time prior to 6:09 p.m. on April 17, 2019. The only texts available prior to this date and time are those Gypsum obtained through subpoenas to non-parties to this litigation.

Mr. Jones became a Clark County Commissioner on January 3, 2019. ECF No. 83 at 3. Thus, before this date, communications on Mr. Jones' phone (and iCloud account) were not conducted in the performance of his duties as a County Commissioner and, therefore, were not within the custody or control of Clark County. *Comstock*, 414 P.3d at 322. However, once Mr. Jones became a Clark County Commissioner, the texts communications and other documents created in

[15] Section 1927 states: "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

the performance of his duties were public records that he was, as a public official, legally required to retain. *Id* at 320-22 ("Under the Nevada Public Records Act …, codified in NRS Chapter 239, all public books and public records of a governmental entity must be open to public inspection unless declared by law to be confidential. NRS 239.010(1). A governmental entity includes elected or appointed officers of this state's political subdivisions. NRS 239.005(5)(a)"; "NRS 239.010(1) cannot be read as limiting public records to those that are physically maintained at a government location or on a government server"; "commissioners' private phones and servers, communications made in the performance of the commissioners' duties on behalf of the public fall within this definition of a public service." ). *See also* NAC 239.155(6); NRS 239.010(1); ECF No. 90-8; Local Government Records Retention Schedules, Nevada State Library, Archives & Public Records (Dec. 21, 2020), https://nsla.nv.gov/ld.php?content_id=60238524 at 9 (requiring executive correspondence—including elected officials—to be maintained permanently).

A review of the history leading to Mr. Jones' deletion of texts shows that prior to becoming a Clark County Commissioner in January 2019, Jones was a lawyer in private practice who, in the fall of 2018, "ran [for the CCBC] on a platform of environmental protections, particularly [the protections of] Red Rock Canyon, and represented the public interest group SRR" in litigation involving Gypsum dating back several years. ECF No. 102 at 13. Indeed, Jones joked about being a superhero who would vanquish his "arch-nemesis," Jim Rhodes, the manager of Gypsum, on behalf of SRR, which sought to prevent Gypsum from developing its Property. ECF Nos. 55-16, 55-30 at 25 ¶ 6.

There is no dispute that beginning on October 21, 2019, three days after Gypsum filed its request asking CCBC to waive Condition 2 preventing the Property development plan from moving forward, Jones communicated with Jim Ferrence, the campaign manager for Steve Sisolak who was then the Chair of the Clark County Commission and running for governor of the State of Nevada. ECF No. ECF No. 55-8. Mr. Jones offered Mr. Sisolak a deal—if Sisolak would commit to vote against the waiver of Condition 2 sought by Gypsum, SRR would send an email blast to its entire email list providing this information, publish support for Sisolak on social media, if desired appear with Sisolak expressing support for Commissioner Sisolak's gubernatorial candidacy, and dismiss

the litigation in which the day before Sisolak was referenced in an "unflattering light." *Id.* Jones sent the same email directly to Sisolak. ECF No. 56 at 107. Jones and the president of the Nevada Conservation League then texted about not hearing back from Sisolak's campaign. Ultimately, Jones stated he had done his part and "[i]f Sisolak doesn't want to play, then it[']s going to blow up in his face tomorrow." *Id*. at 123; *see also id*. at 124. Sisolak acquiesced to the deal and put out a public statement making clear he would "oppose waiving" conditions (*id*. at 127),[16] and stating he would delay the vote on the requested waiver "until two new commissioners" (one of whom would be Jones) were seated in January 2019. ECF No. 56 at 127.

CCBC staff twice recommended approval of Gypsum's waiver request. ECF No. 55-6; 55-7. The first approval was prepared for the December 5, 2018 CCBC meeting. ECF No. 55-6. Logic dictates this recommendation was made and distributed to Commissioners before the December 5, 2018 meeting was scheduled to take place. The second staff recommendation to approve Gypsum's waiver request was obviously distributed before January 18, 2019. This is clear because at 2 a.m. on January 18, 2019 when Ms. Sami Real distributed the staff recommendation that was now to deny Gypsum's waiver. ECF No. 55-7; 55-19. The January 18, 2019 changed recommendation was just five days before the January 23, 2019 CCBC meeting was to take place. ECF No. 55-7. Ms. Real was asked at her June 2021 deposition what prompted the change, but she could not remember; however, she admitted agreeing with the original recommendation to approve the waiver. ECF No. 55-18 at 9-14. Ms. Real also said she could think of nothing other than the fact that Mr. Jones was sworn in as County Commissioner on January 3, 2019 and her own curiosity that lead to the changed recommendation. *Id*. at 14. Ms. Real's February 2023 declaration states she now somehow remembers and is certain the changed recommendation "had nothing to do with any direction … [she] received from Commissioner … Jones." ECF No. 102-13 ¶ 5. What prompted this new memory is not explained.

By April 17, 2019, (1) Jones had replaced Brager and was now the Commissioner representing the district covering Gypsum's Property on which SRR had opposed development, (2)

---

[16] Sisolak referenced the two conditions at issue, but only Condition 2 was "key" as Defendants admit. ECF No. 102 at 8.

the CCBC had issued the revised staff recommendations to deny Gypsum's waiver request, and (3) Sisolak was Governor of Nevada.  At 2:56 on April 17, 2019, the Board voted unanimously to deny Gypsum's waiver of Condition 2.  ECF No. 56 at 248.  By 6:09 p.m. all text messages on the phone Mr. Jones used to conduct Clark County Commissioner business were deleted.  ECF No. 56 at 501.

The totality of the evidence presented leaves little doubt that the disappearance of all texts from Mr. Jones' phone was not an unidentifiable aberration of electronics or some other unidentified accident, but the result of a purposeful act that, as Clark County says, was "knowingly done against [County] policy."  ECF No. 102 at 17.  This evidence supporting this conclusion includes, but is not limited to, the forensic examination of Mr. Jones' cell phone, Jones' deposition testimony in this case, two declaration executed by Jones, and the many arguments made by or on behalf of Mr. Jones in which he has never once offered any reasonable or reliable explanation for the disappearance of every text on his phone just three hours after the vote to deny Gypsum's waiver request on April 17, 2019.  In the absence of any explanation for the deletion of texts from a phone and account never outside of Mr. Jones' control, the Court is left with only one explanation—Mr. Jones deleted all texts for an improper purpose.

An objective view of the facts before the Court, and in the absence of any explanation for the deletion of texts from a phone and account never outside of Mr. Jones' control, the Court is left with one reason Mr. Jones would have acted as he did.  Mr. Jones deleted all texts knowing the role he played in achieving the vote to deny Gypsum the waiver it sought and he did not want his dedicated involvement in this outcome, or his communications with the Sisolak campaign, Commissioner Sisolak or anyone else with whom he communicated about the deal he struck, to come to light.

Mr. Jones represented SRR in an effort to stop Gypsum's development of its Property for over two years.  While that suit was pending, Jones was campaigning for his Commissioner's seat and promised to try to stop Gypsum's Property development within 100 days of being elected.  The lawsuit in which Sisolak was negatively portrayed was dismissed in November 2018 shortly after the dates of the few recovered texts between Jones and the Sisolak campaign.  The dismissal came less than two months before Mr. Jones became a County Commissioner, and then, shortly after Jones

became Commissioner the Commission staff who had twice recommended approval of Gypsum's waiver changed the recommendation to deny Gypsum's waiver.  No one has offered an explanation of why this recommendation was changed.  No plausible explanation for these events is offered to the Court by Mr. Jones or Defendants.

Gypsum filed the instant litigation against Defendants alleging constitutional violations and a breach of contract on May 19, 2019.  ECF No. 1.  When Mr. Jones was deposed in this case on April 23, 2021, he stated, under oath, he did not know and could not say what happened to all of his text messages predating November 2019 because he is not "a technology person."  ECF No. 55-17 at 13.  When asked to confirm all text messages with Ferrence (Sisolak's campaign manager) were deleted, Jones again claimed a lack of knowledge and that he did not know whether those texts were deleted.  *Id*. at 14-15.  Mr. Jones stated in testimony it was "possible" he had text message communications with Sisolak in 2018.  *Id*. at 15.  When Mr. Jones was asked whether he preserved all documents for the period of time before he was elected to CCBC, Jones stated: "As far as I know." ECF No. 82-1 at 15.  But, Mr. Jones knew when he gave this testimony that he had communicated with Sisolak and his campaign to obtain a deal that would help Jones fulfill a campaign promise. Mr. Jones also knew he had not preserved these documents.  Mr. Jones knew he had deleted public records—texts exchanged after he became a County Commissioner.  Indeed, the Court notes Jones never challenged the accuracy or legitimacy of the texts and emails recovered from others or, after their disclosure, offered updated testimony through a declaration suggesting his memory was refreshed.

All in all, Jones' testimony as a Clark County Commissioner, an attorney with demonstrated familiarity with litigation and the requirement to preserve evidence, an attorney who had litigated with Gypsum for over two years before becoming Commissioner, and an attorney who understood his independent obligations to be truthful when under oath at deposition, appears to have carefully chosen words that were not out-and-out misrepresentations of the truth, but also were not truthful.

The Court understands Mr. Jones' deposition testimony was before the September 2021 U.S. Bankruptcy Court Order requiring a forensic image of his phone and before the forensic report evidenced that all texts as of April 17, 2019 at approximately 6:09 p.m. were deleted.  ECF No. 55-

27.  Mr. Jones' deposition testimony was also before the forensic examiner stated: "there were no text messages accessible on Jones' cell phone or iCloud account prior to April 17, 2019, regardless of whether it hit on a search term" and "the first text message that remains on the phone was sent at 6:09:34 PM on April 17, 2019."  ECF No. 55-35 ¶ 11.  The Court cannot ignore that Mr. Jones vehemently opposed a motion to compel pending in the U.S. Bankruptcy Court that sought to compel documents from the County and a forensic image of his phone.  ECF No. 82 at 7 *citing* ECF No. 55-30.  In his second declaration, Mr. Jones admitted saving Red Rock was his "passion," stated his conduct was ethical, and asserted the April 2019 vote by the Board was based on the recommendation of Clark County Comprehensive Planning and Public Works staff (*id*. at 25-29).  Mr. Jones remained silent about his deal with Sisolak, obtaining a delay on the vote regarding the waiver request, the change in the Commission staff recommendation distributed at 2 a.m. on January 18, 2019 by Ms. Real, or that this was 15 days after Jones took his seat as a County Commissioner.  The Court cannot ignore that the SRR counterclaims against the County were dismissed in early November (without a Commissioner vote to approve the dismissal).  In contrast, Jones ignores the reason he voted against the waiver request was not because Commission staff recommended he do so, but because denying the waiver request was what he had been working towards for two years.

Mr. Jones may have been "factually honest" about what his phone did contain during his deposition testimony, but the above facts belie the notion that Mr. Jones was honest about what his phone did not contain and why.  Jones' attacks on Gypsum's frustration with the deletion of his text messages was not a "witch hunt" as he states.  That Jones did not remember the events of late 2018 and early 2019 when testifying at deposition and executing declarations is simply not plausible under the totality of circumstances.

At the risk of redundancy, the Court again stresses that Mr. Jones never once offered any explanation for what happened to all of his text messages three hours after the April 17, 2019 vote by CCBC achieving what he sought and promised to try to achieve—vanquishing his "arch nemesis" and preventing development of Gypsum's Property.  The Court can find no logical—even if unlikely—explanation for what happened to Mr. Jones' texts other than the disappointing explanation that Mr. Jones deleted his texts worried the disclosure would yield a negative or

unfavorable outcome for him.  That Mr. Jones was less than candid about the deletion when testifying at deposition and in declarations, as well as when presenting argument to this Court is clear.  Whether the act of deleting the evidence was in bad faith or for an improper motive is not a close call.

The Court does not take lightly the implications of finding bad faith or an improper motive is applicable to Commissioner Jones' conduct.  But, there can be no meaningful dispute that Mr. Jones is litigation savvy and understands the destruction of evidence may lead to sanctions given he is the attorney who sent the December 15, 2016 preservation letter to the County.  ECF No. 55-49. Mr. Jones made an unmistakable campaign promise during his 2018 campaign for the County Commission to try to defeat Gypsum's development of its Property within his first 100 days in office (ECF No. 55-4) while simultaneously communicating with Sisolak's gubernatorial campaign suggesting things would "blow up" for Sisolak if he did not come out publicly against approval of the waiver Gypsum sought, which CCBC staff twice approved.  ECF Nos. 55-6; 55-7; 56 at 123.

The complete absence of any cogent explanation of what happened to all of Commissioner Jones' texts, including those that would be public records he was required to maintain as a matter of law once he became a Commissioner on January 3, 2019, demonstrate what happened is something more than an accident.  The evidence before the Court supports the finding that the motive for the deletion was improper leading to needless delay in this case that prejudiced Gypsum.  As stated by one court, albeit not precedent for the District of Nevada, the absence of a cogent explanation for the loss of potentially relevant evidence (discussed below) "points to one answer," bad faith.  *In re Skanska USA Civil Southeast Inc.*, 340 F.R.D. 180, 189 (N.D. Fla.  2021).

Mr. Jones deleted his texts for the improper purpose of attempting to prevent discovery of his conduct and the deal giving him time to make good on a campaign promise to kill Gypsum's Property development.  Jones knew once he prevailed, Gypsum would not simply walk away—not after litigating the right to develop its property beginning with litigation in 2005.  Whether Jones specifically foresaw the litigation filed is not necessary for the exercise of the Court's inherent authority to sanction a nonparty who engages in tactics attempting to mislead parties and the Court by knowingly offering information carefully shrouded in selected words that hide the truth.

Setting aside the Motion for an evidentiary hearing and the motion practice in U.S. Bankruptcy Court, the instant Motion for Sanctions would clearly not have been necessary absent Mr. Jones' deletion of all his texts, including, and importantly, those he was required by law to retain once he became a County Commissioner.  NAC 239.155(6); NRS 239.010(1); ECF No. 90-8; *Comstock*, 414 P.3d at 320-323; Local Government Records Retention Schedules, Nevada State Library, Archives & Public Records (Dec. 21, 2020), https://nsla.nv.gov/ld.php?content_id=60238524 at 9 (requiring executive correspondence, including elected official correspondence, to maintained permanently).  The Court finds Jones' carefully crafted answers in deposition and statements in declarations, and repeated suggestion that he lacked any understanding of how all his texts disappeared was knowingly given in effort to obfuscate.  The Court rejects the arguments and Mr. Jones' testimony, in this case, suggesting there is no "there there" when it comes to Gypsum's assertion that Jones deleted all texts just three hours after the April 17, 2019 vote.  Further, even if Mr. Jones had no "legal duty" to preserve texts before he became a Commissioner, there is no doubt he had such a duty as of January 3, 2019 when he assumed his Commissioner role.  Although he has had plenty of time to do so, Mr. Jones has never corrected his testimony—instead, he continues to suggest that Gypsum misrepresents facts to the Court solely to fulfill a vendetta against him.[17]  Mr. Jones multiplied and delayed this litigation and prejudiced Gypsum.

"Courts have the inherent power to impose sanctions for abuses of the judicial system, including the failure to preserve or produce documents."  *Hartford Casualty Insurance Co. v. Winston Company, Inc.*, Case No. 09-CV-5088, 09-CV-576, 2011 WL 13382162, at *6 (N.D. Ill. May 18, 2011) *citing Chambers*, 501 U.S. at 43 (1991); *Barnhill v. U.S.*, 11 F.3d 1360, 1367 (7th Cir. 1993) (finding the inherent authority of the Court to sanction "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly

---

[17] *See Sierra Glass & Mirror v. Viking Industries, Inc.*, 808 P.2d 512, 516 (1991) (finding "most egregious" the failure to correct a misstatement once counsel was aware of contrary facts.).  Even after the forensic report demonstrating deletion of every text on Mr. Jones' phone at approximately 6:09 p.m. on April 17, 2019, Mr. Jones, an attorney, through motion practice by his counsel, continued to suggest that Jones was nothing less than completely honest with respect to what happened to his texts.  *See* ECF No. 83 at 4 (saying Jones "responded factually" by stating only texts as of November 2019 were on his phone, ignoring what happened to the texts predating November 2019 and ignoring Gypsum presented evidence that Jones appears to have continued to delete texts after April 17, 2019.  *See* ECF No. 55-50 at 7.

and expeditious disposition of cases." *Citing Link v. Wabash R. Co.,* 370 U.S. 626, 630–31 (1962)). This Court has the "inherent power to impose sanctions to protect the integrity of the judicial process." *Bioconvergence LLC v. Attariwala*, Case No. 20-mc-101(RC), 2023 WL 2086078, at *18 (D.D.C. Feb. 17, 2023) (internal citations omitted). "This inherent power allows courts to guard against abuses of the judicial process with contempt citations, fines, awards of attorneys' fees, and such other orders and sanctions as they find necessary, including even dismissals and default judgments." *Id*. (internal citation omitted).

Mr. Jones' lack of candor and deletion of texts have increased and will continue to increase the burden on Gypsum as it prosecutes this case and negatively impacts the expeditious disposition of this matter. The deletion of all texts, especially those Mr. Jones was required to preserve as a County Commissioner because they were public records, left a gaping hole for the time period of January 3, 2019, when Mr. Jones became Commissioner, through April 17, 2019, the date of the vote. The Court is permitted to presume that Mr. Jones' deleted text communications for this time period, as well as the time period during his campaign for County Commissioner, would have been unfavorable to Mr. Jones and the County, they would have assisted Gypsum in potentially proving, if nothing else, a breach of the express good faith requirement the County assumed when it signed the 2010 settlement agreement with Gypsum. *Zest IP Holdings, LLC v. Implant Direct Mfg., LLC*, Case No. 10-0541-GPC(WVG), 2013 WL 6159177, at *9 (S.D. Cal. Nov. 25, 2013) ("spoliation of evidence carries the presumption that the destroyed evidence goes to the merits of the case" and recommending an adverse inference). As explained in the Court's November 15, 2022 Order (ECF No. 78 at 13 "even if the Court assumes" Gypsum's § 1983 equal protection claim and takings claims fail, Mr. Jones' spoliation of evidence was potentially relevant to Gypsum's breach of contract and breach of the express good faith provision claims. ECF No. 78 at 10 n.12.[18]

---

[18] Recognizing the County previously raised the issue that a breach of contract by a municipal entity would be decided under the arbitrary and capricious standard, an argument the County raises again, the Court reiterates its finding to the contrary. The Court rejected the case law cited by the County and "found several cases in[volving] contract based claims against a county, state, or a subdivision thereof [that] were considered based on the application of state law. *Blanck v. Hager*, 360 F.Supp.2d 1137 (D. Nev. 2005) (finding in favor of Washoe County School District, a political subdivision of the State of Nevada, and against the plaintiff on the plaintiff's breach of contract and breach of good faith and fair dealing claims applying Nevada contract law to these claims); *County of Orange v. Tata Consultancy Services LTD*, Case No. SACV 13-683 JLS (JCx), 2014 WL 12603074 (C.D. Cal. Feb. 12, 2014) (in which the court, applying California contract law, rejected the County's motion to dismiss a breach of good faith and fair dealing claim as

Based on the facts summarized above and the law applicable to the Court's inherent authority to issue sanctions against a non-party, the Court finds Mr. Jones is properly sanctioned. Having found Mr. Jones acted for an improper purpose, the Court determines the appropriate sanction, which requires the Court weigh "(1) the public's interest in expeditious resolution of litigation; (2) the Court's need to manage its docket; (3) the risk of prejudice to the … [opposing party]; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *James v. Wilber*, 956 F.Supp.2d 1145, 1168-69 (E.D. Cal. 2013) *citing In re Phenylpropanolamine (PPA) Products Liability Litigation,* 460 F.3d 1217, 1226 (9th Cir. 2006) (internal quotations and citations omitted). "These factors guide a court in deciding what to do and are not conditions that must be met in order for a court to take action." *Id. citing id.* Prejudice, the most important factor for this Court, "looks to whether the wrongful actions impaired the opposing party's ability to go to trial or threatened to interfere with the rightful decision of the case." *Id*. at 1169 (citation omitted).

The public's interest in expeditious resolution of litigation together with the public policy favoring disposition of cases on their merits are negatively impacted by Mr. Jones' deletion of text messages. However, as stated, Gypsum's breach of contract and good faith and fair dealing claims could be significantly prejudiced by the absence of Mr. Jones' texts. What Gypsum has pieced together does not defeat the fact that all texts dated as of January 3, 2019 through the vote on April 17, 2019 were deleted. The Court finds it proper to infer these texts would support Gypsum's breach of good faith claim. The deleted information cannot be divined but can be assumed to have favored Gypsum.

The Court declines to make a report to the State Bar of Nevada as Mr. Jones has rights with respect to misconduct allegations that are best handled by the Bar through a report by Plaintiff's counsel, if any, is made. As stated by the Ninth Circuit, "an attorney subject to discipline is entitled to procedural due process, including notice and an opportunity to be heard." *Weissman v. Quail*

---

duplicative of a breach of contract claim because the "allegations plausibly suggest[ed] that the County breached the implied covenant of good faith and fair dealing by consciously and deliberately acting to frustrate Tata America's entitlement to be paid for the work it performed under the Contract"); *General Security Services Corporation v. County of Fresno*, 815 F.Supp.2d 1123 (E.D. Cal. 2011) (in which the court analyzed a breach of contract and breach of covenant of good faith and fair dealing under California contract law)."

*Lodge, Inc.*, 179 F.3d 1194, 1198 (9th Cir. 1999). That process should start and end with the State Bar.

The Court also declines to issue fines as these are often issued to coerce compliance with a court order or as the result of civil contempt proceedings.[19] In this circumstance the Court finds an award of attorney's fees and costs to Gypsum associated with preparation of the Motion for Sanction against Mr. Jones, review of Mr. Jones' Opposition, and preparation of the Reply are granted given the continued meritless contention that Gypsum's concerns were a "witch hunt" or chasing "the proverbial rabbit down the hole." ECF No. 83 at 4, 16. The Court recognizes Gypsum submitted fees and cost materials previously; however what was submitted seeks monetary sanctions in far greater scope than the Court orders herein. Thus, Gypsum is required to resubmit its fees and costs, with appropriate redactions, representing the time spent and costs incurred for the preparation of the Motion for Sanctions (ECF No. 82), review of the Opposition (ECF No. 83), and preparation of the Reply (ECF No. 87). The submission must be accompanied by information allowing the Court to review the reasonableness of the billing rates for counsel and support staff (if any), and the time recorded for which Gypsum will be reimbursed. Mr. Jones will have ten (10) days to file a response. No reply is permitted without prior Court approval.

B. Spoliation As Applied to Defendants.

"Spoliation [by a party] is 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation.'" *Medina v. Boeing Company*, Case No. 8:20-cv-00304-JVS-JEM, 2022 WL 599021, at *1 (C.D. Cal. Jan. 27, 2022), *citing Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009). "As a general matter, there is no question that the duty to preserve relevant evidence may arise even before litigation is formally commenced." *Apple Inc. v. Samsung Electronics Co., Ltd*, 888 F.Supp.2d 976, 990 (N.D. Cal. 2012) (internal citation omitted). The duty to preserve is an "objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in

[19] The Court also considered entry of an adverse inference that the deleted texts would support Gypsum's breach of good faith and fair dealing; however, this would be a sanction against the remaining Defendants and unless the remaining Defendants are liable in their own right for Mr. Jones' destruction, such a sanction is inappropriate.

the same factual circumstances would have reasonably foreseen litigation." *Id*. (internal citations omitted).

In considering what spoliation sanction to impose, if any, courts generally consider three factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Nursing Home Pension Fund v. Oracle Corp.,* 254 F.R.D. 559, 563 (N.D. Cal. 2008) (internal citations and internal quote marks omitted). While "[c]ourts have not been uniform in defining the level of culpability—be it negligence, gross negligence, willfulness, or bad faith,"[20] in the Ninth Circuit, "destruction of evidence need not be in 'bad faith' to warrant a court's imposition of sanctions." *In re Napster, Inc. Copyright Litig.*, 462 F.Supp.2d 1060, 1066 (N.D. Cal. 2006). Nonetheless, "a party's motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed." *Id*. at 1066-67.

*i. When is litigation foreseeable.*

"Although the Ninth Circuit has not precisely defined when the duty to preserve is triggered, trial courts in this Circuit generally agree that, "[a]s soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." *Apple, Inc.*, 888 F.Supp.2d at 991 (internal citations and quote marks omitted; brackets in original). The fact that a person or entity "could file a complaint or even might" do so is not enough to trigger the duty to preserve ESI. *Aberin v. American Honda Motor Company, Inc.*, Case No. 16-cv-04384-JST, 2017 WL 6493095, at *2 (N.D. Cal. Dec. 17, 2017). "The future litigation must be probable, which has been held to mean more than a possibility." *In re Napster*, 462 F. Supp.2d at, 1068. "A general concern over litigation does not trigger a duty to preserve evidence." *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 264 F.R.D. 517, 526 (N.D. Cal. 2009). Litigation is foreseeable "when a party should have known that the evidence may be relevant to future litigation." *Brown v. Albertsons, LLC*, Case No. 2:16-cv-01991-JAD-PAL, 2017 WL 1957571, at *5 (D. Nev. May 11, 2017) *citing Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.

[20] *Scalia v. County of Kern*, 576 F.Supp.3d 703, 720 (E.D. Cal. 2021) *citing Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 800 (N.D. Tex. 2011) (citing *Victor Stanley v. Creative Pipe, Inc.*, 269 F.R.D. 497, 529-31 (D. Md. 2010)).

1998).  Whether litigation is foreseeable is a fact intensive question that must be assessed on a case-by-case basis.  *Micron Tech., Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1320-21 (Fed. Cir. 2011)(collecting cases).  This assessment is a flexible, fact specific standard that allows a district court to exercise the discretion necessary to confront the various factual situations inherent in a spoliation inquiry.  *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).

Attempting to illuminate this standard, the Court notes two cases holding a U.S. government investigation does not create a duty to preserve evidence with respect to later civil litigation in the United States.  *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F.Supp.2d 1299, 1308 (N.D. Ga. 2011) (in which the Court was "unwilling to conclude that upon service of a DOJ-issued … [Civil Investigatory Demand], a duty to Plaintiffs to preserve documents devolved upon Delta even though Plaintiffs did not file this action until three months later"); *Point Blank Sols., Inc. v. Toyobo Am., Inc.*, Case No. 09-61166-CIV, 2011 WL 1456029, at *1 (S.D. Fla. Apr. 5, 2011)  (recognizing the defendants' lackluster adherence to their nebulous oral instruction to preserve documents after government subpoenas were received, but where alleged destruction of evidence arose primarily when defendants were under a duty to others—government officials who issued subpoenas—not the plaintiffs, and where other litigants to whom defendants owed a duty of preservation to were not parties to the litigation at issue and had not sought sanctions in their own right, the court was "reluctant to create a new legal precedent which would establish some type of free-floating or shifting duty which other parties could latch onto in order to seek the sanctions which the parties with standing choose not to pursue.").  *See also PersonalWeb Technologies, LLC v. Google, Inc.*, Case No. C13-01317-EJD (HRL), 2014 WL 580290, at *3 (N.D. Cal. Feb. 13, 2014) (a party cannot foresee litigation before it has standing to sue); *Oracle America, Inc. v. Hewlett Packard Enterprise Company*, 328 F.R.D. 543, 550 (N.D. Cal. 2018) ("A party should only be penalized for destroying documents if it was wrong to do so, and that requires, at a minimum, some notice that the documents are potentially relevant.") (citation omitted).  For example, in *Abcon Assocs., Inc. v. Haas & Najarian*, the court held the plaintiff did not have a duty to preserve evidence for a "novel" defense to a breach of contract action the plaintiff could not have anticipated.  Case No. CV 12-928 LDW AKT, 2014 WL 4981440, at *11 (E.D.N.Y. Oct. 6, 2014).

*ii. Who exercises control over the destroyed evidence.*

Spoliation sanctions are only available against the party who had possession or control of the missing evidence. *Scalia*, 576 F.Supp.3d at 717 *citing Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995) ("it is essential that the evidence in question be within the party's control"); *see also Allen v. Woodford*, Case No. CV-F-05-1104 OWW LJO, 2007 WL 309945, at *2 (E.D. Cal. Jan. 30, 2007) (for purposes of discovery, the court may consider whether "a party can order the person or entity in actual possession of the documents to release them"). The analysis of possession or control in *Scalia* is instructive.

Citing *Silvestri v. Gen. Motors Corp.*, the court in *Scalia* notes "a party that 'does not own or control the evidence, … still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence.'" 576 F.Supp.3d at 717 *citing* 271 F.3d 583, 591 (4th Cir. 2001). "*Silvestri* and its progeny [also hold that] 'courts have extended the affirmative duty to preserve evidence to instances when that evidence is not directly within the party's custody or control so long as the party has access to or indirect control over such evidence.'" *Id*. (internal citations omitted). Examples of sufficient access or indirect control cited in *Scalia* include when a defendant's husband was in possession of evidence,[21] and "when a plaintiff contracted to store business documents on computer servers owned by a third party."[22] The court in *Scalia* also noted one case in which no indirect custody or control was found. In *Wilder v. Rockday Cnty*, Case No. 1:13-CV-2715-RWS, 2015 WL 1724596 (N.D. Ga. Apr. 15, 2015), the widow of a man who died in custody sought videos of the deceased while incarcerated, including videos involving his visits to the medical area of the jail. *Scalia*, 576 F.Supp.3d at 719 *citing Wilder*, 2015 WL 1724576, at *1. The jail produced some videos, but not videos involving denial of medical care. *Id. citing id.* The court found the jail contracted with a third party who was responsible for programming the jail's "video recording system to automatically overwrite old videos after approximately thirty days" and the contracted health care provider had no control over the video system. *Id. citing Wilder*, 2015 WL 1724576, at *3. The only individuals

---

[21] *World Courier v. Barone*, Case No. C 06-3072-TEH, 2007 WL 1119196, at *1 (N.D. Cal. Apr. 13, 2007).

[22] *Cyntegra, Inc. v. Indexx Labs.*, Case No. CV 06-4170 PSG (CTx), 2007 WL 5193736, at *5 (C.D. Cal. Sept. 21, 2007).

who had control were "senior jail staff and the Sheriff." *Id*. *citing id*. Thus, the Court found there was no basis for sanctions against the health care provider because the provider lacked control over the documents (videos) sought. *Id*.

In addition to the above, the parties know from the February 10, 2023 Order (ECF No. 78) that the Court considered, *inter alia*, *Victor Stanley, Inc.*, *supra*, 269 F.R.D. at 497, in which defense counsel was held to be a defendants' agent resulting in defendants' liability for its counsel's spoliation of evidence. *Id*. at 515 n.23 *citing Link*, 370 U.S. at 633-34 (an attorney is a "freely selected agent" such that there was "no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client"); *Rouse v. Lee*, 339 F.3d 238, 249 (4th Cir. 2003) ("Former counsel's errors are attributable to … [plaintiff] not because he participated in, ratified, or condoned their decisions, but because they were his agents, and their actions were attributable to him under standard principles of agency."); *Goodman v. Praxair Servs., Inc.*, 632 F.Supp.2d 494, 522 n.16 (D. Md. 2009) ("A party may be held responsible for the spoliation of relevant evidence done by its agents").

The Court also considered *Wilson v. Beloit Corp.*, 921 F.2d 765 (8th Cir. 1990), in which the court relied on a 1987 Kansas Supreme Court decision stating: "Appellant readily concedes that the tort of spoliation of evidence is relatively new and so far as we can determine very few states have actually recognized such a tort. Absent some special relationship or duty arising by reason of an agreement, contract, statute, or other special circumstance, the general rule is there is no duty to preserve possible evidence for another party to aid that other party in some future legal action against a third party." *Id.* at 767 *citing Koplin v. Rosel Well Perforators, Inc.*, 734 P.2d 1177, 1179 (Kan. 1987). The Court distinguished *Beloit* from the case at bar because Nevada rejected an independent tort of spoliation in 2002. *Timber Tech Engineered Bldg. Prods. v. Home Ins. Co.*, 55 P.3d 952 (2002).

The Court also considered *Colonies Partners, L.P. v. County of San Bernardino*, Case No. 5:18-cv-00420-JGB (SHK), 2020 WL 1496444 (C.D. Cal. Feb. 27, 2020), in which the plaintiff sued a county employee (a district attorney) together with the county under 42 U.S.C. § 1983. The content of the employee's personal email accounts and cell phone were at issue. *Id*. at **3-4. Ultimately,

the court found: "An entity and employee defendant[] can both be under a duty to preserve, and therefore culpable for spoliation of ESI, even if one or the other is directly responsible for the destruction of evidence." *Id*. at 4 (collecting cases involving an employee-employer relationship). The Court also reviewed *Petit v. Smith*, 45 F.Supp.3d 1099 (D. Ariz. 2014), in which the District of Arizona considered whether a non-party, the Arizona Department of Correction ("ADC"), could be sanctioned for destruction of evidence by its employee-correctional officers. The court stated: "ADC is not a disinterested third party. It is responsible for Defendants' training and conduct, and it had complete control over the relevant evidence in this case and over Plaintiff's ability to access that evidence and Defendants' ability to preserve it. … Because ADC controls the evidence and who has access to it, and the State is defending this case and will pay any judgment that results from it, the Court cannot conclude that ADC is merely a disinterested third party with no duty to preserve evidence." *Id*. at 1106. The Court then held: "Given these special circumstances, the Court finds that ADC had a duty to preserve evidence relevant to this case once it knew that litigation was reasonably likely." *Id*.

In *Peters v. Cox*, 341 F.Supp.3d 1192, 1194 (D. Nev. 2018), the court considered an objection to a magistrate judge order in which the judge refused to hold a third party responsible for the destruction of evidence after finding that doing so would be "contrary to law[] because a defendant cannot be sanctioned for the acts of a person over which she has no authority or control …." The district judge affirmed the magistrate judge's ruling because the defendant had a Seventh Amendment right to a jury trial on the elements of an excessive force claim asserted, which could only be "forfeited … if she had personal culpability for spoliation of evidence material to those elements, and Plaintiff made no showing that this was the case." *Id*.

*iii. Foreseeability and Control Applied to Clark County and the CCBC.*

Although the County litigated with Gypsum twice before the instant case commenced in May 2019, the Court finds the unanimous vote of the CCBC on April 17, 2019 would not have established that future litigation was probable. That litigation was possible—certainly. That there may have been a general concern about future litigation—again, possibly. But a potential claim was not identified by Gypsum or the County, Gypsum did not send a pre-litigation preservation letter to

Defendants, Gypsum did not indicate it was planning litigation, did not email, text or send traditional mail alerting the County to its intentions, and Gypsum does not offer evidence of telephone conversations that provided a warning. Whether the County "should have known" Gypsum would file a lawsuit claiming constitutional violations is again something that could have occurred, but that it should have occurred to the County is too far for this Court to support.

Moreover, even if litigation was or should have been foreseen by the County, there is nothing before the Court demonstrating that anyone at the County who would have issued a preservation hold letter sometime on or immediately after the April 17, 2019 vote had any knowledge of what was on Mr. Jones' phone. There is no evidence that anyone, other than Jones, had any reason to believe, given state law and County policy, that Jones would delete all texts on his personal phone within approximately three hours of the CCBC vote denying Gypsum's request to waive Condition 2. There is nothing presented supporting the conclusion or that would allow the Court to reasonably infer the County was aware of Mr. Jones' communications with Commissioner and then-candidate Sisolak, his campaign, the Nevada Conservation League, or anyone else about a deal with Sisolak that would fulfill Mr. Jones' campaign promise to keep Gypsum from developing its Property within the first 100 days of Jones' role as a County Commissioner.[23]

There is also no reason for the County to have expected Mr. Jones, a brand new County Commissioner and experienced lawyer, to violate preservation obligations, state law, and County policy by deleting all text messages on his phone about three hours after the County vote. Hence, even recognizing the content of Mr. Jones' personal phone, including text messages, commencing with his assumption of his Commissioner duties on January 3, 2019, gave the County technical control over the public records stored on that phone, the Court finds no legal basis to hold the County responsible for Mr. Jones' spoliation of evidence as the County could not have anticipated Jones' wrongful conduct. That is, even if the County had issued a preservation letter, memo or email to all County Commissioners on April 18, 2019—one day after the CCBC vote—it would not have changed the destruction by Mr. Jones on April 17, 2019. In the absence of evidence showing the County knew or should have known what was on Mr. Jones' phone, and in the absence of

[23] The Court recognizes it was 105 days from January 3, 2019 to April 17, 2019.

information that reasonably leads to the conclusion that the County should have known Gypsum would file a lawsuit, the Court cannot find the County responsible for Mr. Jones' destruction of text messages on April 17, 2019. *In re Napster, Inc.*, 462 F. Supp.2d at 1066-67 ("a party's motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed") (internal citation omitted).

Foreseeability and responsibility changed on May 19, 2019 when Gypsum filed its lawsuit. Once the duty to preserve arises, a litigant is expected, at the very least, to "suspend its routine document and retention/destruction policy and to put in place a litigation hold." *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 218 (S.D.N.Y. 2003) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 436 (2d Cir. 2001)). There is no dispute the County never sent a litigation hold to County Commissioners. The preservation sent in August 2020—more than a year after the litigation commenced—was only sent to some staff. Further, a preservation notice sent in 2016 would, under no circumstances, have gone to the Commissioners first elected in 2018 (including Mr. Jones). And, the subject matter of the 2016 and 2019 litigation, while related, were not identical.

The failure to issue a preservation notice to County Commissioners is supported by the deposition of four County Commissioners. While Gypsum correctly states the County did nothing to preserve public records pertaining to the issues being litigated in this case (ECF No. 90 at 8) and this failure was a violation of the County's document retention policy requiring record retention "in compliance with applicable laws and regulations,"[24] each County Commissioner deposed said they either searched for and found no relevant documents or knew they had not discussed Gypsum's waiver application or Gypsum generally through texts that would have resided on their phones. *See* ECF No. 102 at 6 (Table).

According to the deposition testimony of Commissioners Naft and Kirkpatrick, each inspected their phones using word searches and found no text messages involving Gypsum. *See id.* Commissioners Naft, Kirkpatrick, and Gibson testified they recalled no discussions involving Gypsum. *Id*. Commissioner Segerblom, who testified his phone blew up every year, nonetheless testified that he never had any text messages regarding Mr. Rhodes or Gypsum. *Id*. In sum, Gypsum

[24] ECF No. 90 at 8, and *citing* 90-10 (the Clark County's Records and Information Management (RIM) Policy)

presents no evidence refuting this testimony.[25] In the absence of any evidence supporting the inference that any Clark County Commissioner, other than Mr. Jones, had potentially relevant evidence on their phones that was lost because of the County's failure to institute a litigation hold letter until August 2020, the Court finds there is no legally sound basis upon which the Court can rely to impose sanctions on the County relating to Commissioners other than Jones.

With respect to Mr. Jones, as stated, there is no authority the Court could locate requiring an instantaneous implementation of a litigation hold.  That is, the Court could find no law suggesting the County's failure to institute a litigation hold immediately after the April 17, 2019 vote at 2:56 p.m. and before 6:09 p.m., by which time all text messages on Mr. Jones' phone were deleted, would support imposition of sanctions.  Indeed, there was nothing the Court could locate suggesting a failure to institute a litigation hold within a day or two of an event that might lead to foreseeable litigation properly leads to sanctions.  Should the County have acted long before August 2020? Absolutely, but in the absence of any evidence that would allow the Court to infer the failure to act reasonably after May 17, 2019, the date on which Gypsum filed its suit, resulted in the loss of any potentially relevant evidence, the Court finds sanctions are not justifiably awarded.  "Sanctions may be levied, however, only when a party knew, or reasonably should have known, that the spoliated evidence was potentially relevant to a claim." *Peschel v. City of Missoula*, 664 F. Supp. 2d 1137, 1141 (D. Mont. 2009) *citing Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).  There is simply no evidence to support the conclusion that Defendants spoliated relevant evidence that would justify the sanctions Gypsum now seeks against Defendants.

**IV.  Order**

IT IS HEREBY ORDERED that Plaintiff's Motion for Imposition of Sanctions against Commissioner Justin Jones for Fraud Upon the Court and Destruction of Evidence (ECF No. 82) is GRANTED in part and DENIED in part.

---

[25]    The County also points out that two Commissioners—Larry Brown and Lawrence Weekly—who served through 2021 were not deposed; nor were subpoenas issued to either of these individuals. *Id*.  Susan Brager, whose County Commission seat Jones filled, was deposed and contents of her phone and personal computer were produced. *Id*. at 5.  Former Commissioner Chris Guinchigliani's personal devices were also produced, but she was not deposed by Gypsum.  *Id*.

IT IS FURTHER ORDERED that Plaintiff must re-submit a memorandum of fees and costs, with appropriate redactions, representing the time spent and costs incurred for the preparation of the Motion for Sanctions (ECF No. 82), review of the Opposition (ECF No. 83), and preparation of the Reply (ECF No. 87). The submission must be accompanied by information allowing the Court to review the appropriateness of the billing rates for counsel and support staff (if any), and the time recorded for which Gypsum will be reimbursed. Mr. Jones will have ten (10) days to file a response. No reply is permitted without prior Court approval.

IT IS FURTHER ORDERED that Plaintiff's Motion for Sanction Against Defendants (ECF No. 90) is DENIED.

Dated this 21st day of April, 2023.

ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE